In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-03-00148-CR
______________________________


DEMETRICE THINE COLEMAN, Appellant
Â 
V.
Â 
THE STATE OF TEXAS, Appellee


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 

On Appeal from the 194th Judicial District Court
Dallas County, Texas
Trial Court No. F02-73242


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Justice Carter


O P I N I O N

Â Â Â Â Â Â Â Â Â Â Â Â Demetrice Thine Coleman appeals from his conviction by a jury for aggravated assault. The
jury assessed his punishment at five years' confinement. On appeal, he contends the evidence is
legally and factually insufficient to support the verdict, that the instructions given were not
applicable to this offense, and that one of the trial court's jury instructions was a comment on the
weight of the evidence. We affirm the judgment of the trial court.
Â Â Â Â Â Â Â Â Â Â Â Â The State alleged Coleman threatened Melvin Brooks with imminent bodily injury and used
or exhibited a firearm during the incident. The evidence presented at trial shows that Coleman,
along with his friend, Samuel West, III, went to an apartment where Michael and Richard Brooks
were helping their brother, Melvin Brooks, move. (Their sister, Donna, has a child fathered by
Coleman). Sam was evidently angry with Michael because some car repairs he had attempted as
a favor had failed, and Sam walked off separately with Michael, pulled a pistol on him, they had a
discussion, and Sam hit Michael in the head with the pistol. The pistol discharged, "grazing"
Michael. Michael then ran back to his brothers, and as he collapsed at their feet, he told them
Coleman had brought Sam to the apartment to shoot him. 
Â Â Â Â Â Â Â Â Â Â Â Â There is evidence that, at that point, Coleman pulled a revolver, pointed it at Melvin and
Richard and told them, "[D]on't move or [I'll] shoot." Melvin nonetheless called 9-1-1 on his cell
phone. In the meantime, Sam entered his car, drove back to the scene, jumped out of his car, and
ran toward them waving a pistol. 
Â Â Â Â Â Â Â Â Â Â Â Â Melvin told Sam and Coleman he had called the police, and Sam yelled to Coleman, "Let's
go," and they ran to Sam's car and drove away.
Â Â Â Â Â Â Â Â Â Â Â Â Coleman testified at trial, and his version of events matched that set out above to the point
they testified he pulled a gun. Coleman testified that he did not pull a pistol and that, after Sam
talked with Michael, Sam drew a gun on both him and the Brookses. Coleman states he then ran to
a friend's apartment and asked for a ride.
Sufficiency of the Evidence
Â Â Â Â Â Â Â Â Â Â Â Â A.Â Â Â Â Â Â Â Â Threat of Immediate Bodily Injury
Â Â Â Â Â Â Â Â Â Â Â Â Coleman raises two sufficiency arguments involving different aspects of the same analysis. 
First, he contends that the evidence was inadequate to show the victims were threatened with
immediate bodily injury and second, that the evidence was inadequate to show his actions were with
the requisite level of intent.
Â Â Â Â Â Â Â Â Â Â Â Â In reviewing the legal sufficiency of the evidence, we view the relevant evidence in the light
most favorable to the verdict and determine whether any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt. Johnson v. State, 23 S.W.3d 1, 7 (Tex.
Crim. App. 2000). In reviewing factual sufficiency, we view the evidence in a neutral light, favoring
neither party. Id. We set aside the verdict only if it is so contrary to the overwhelming weight of the
evidence as to be clearly wrong and unjust. Id. 
Â Â Â Â Â Â Â Â Â Â Â Â As indicted, the statutory elements of aggravated assault applicable in this case are:
(2) intentionally or knowingly threatens another with imminent bodily injury
[the assault];

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â . . . .
Â 
(2) uses [and] exhibits a deadly weapon [to wit, a firearm,] during the
commission of the assault.

Tex. Pen. Code Ann. Â§Â§ 22.01(a)(2), 22.02(a)(2) (Vernon Supp. 2004).
Â Â Â Â Â Â Â Â Â Â Â Â In connection with the contention the State did not prove threat of imminent bodily injury,
counsel argues that, because Coleman only warned them that if they moved he would shoot them,
the threat was not immediate, but was insteadâmediate.
Â Â Â Â Â Â Â Â Â Â Â Â Aggravated assault by threat is described as a nature-of-conduct offense. See Guzman v.
State, 988 S.W.2d 884, 887 (Tex. App.âCorpus Christi 1999, no pet.). Accordingly, our focus is
not on a victim's perception of the defendant's behavior; rather, we look at the acts and culpability
of the defendant, that is, whether the defendant intended to cause or knowingly "cause[d] in the
victim a reasonable apprehension of imminent bodily injury." Edwards v. State, 57 S.W.3d 677, 680
(Tex. App.âBeaumont 2001, pet. ref'd); see Trevino v. State, 752 S.W.2d 735, 736â37 (Tex.
App.âEastland), pet. dism'd, 759 S.W.2d 142 (Tex. Crim. App. 1988).
Â Â Â Â Â Â Â Â Â Â Â Â The State, therefore, was required to prove beyond a reasonable doubt Coleman intentionally
or knowingly placed Melvin in reasonable apprehension of imminent bodily injury when he pointed
a pistol at him and Richard and ordered them not to move. Imminent means near at hand; "mediate
rather than immediate; close rather than touching; impending; on the point of happening; threatening;
menacing; perilous." Devine v. State, 786 S.W.2d 268, 270 (Tex. Crim. App. 1989); In re S.B., No.
2-01-350-CV, 2003 WL 22069764, at *7 (Tex. App.âFort Worth Aug.Â 29, 2003, no pet. h.); In re
A.C., 48 S.W.3d 899, 904 (Tex. App.âFort Worth 2001, pet. denied).
Â Â Â Â Â Â Â Â Â Â Â Â In connection with the "imminence" argument, the Fort Worth Court of Appeals recently
wrote that conditioning a threat of harm on the occurrence or nonoccurrence of a future event does
not necessarily mean that the harmful consequences threatened are not imminent. Rather, the focus
of the inquiry should be whether the complainant was afraid of imminent serious bodily injury at the
time of the offense. Neagle v. State, 91 S.W.3d 832 (Tex. App.âFort Worth 2002, pet. ref'd); A.C.,
48 S.W.3d at 904.
Â Â Â Â Â Â Â Â Â Â Â Â In the present case, two of the brothers, Melvin and Richard, testified that Coleman pointed
a revolver at them, threatened them, and that they felt threatened and scared for their lives because
they believed he was going to shoot them. This evidence is legally sufficient to support the jury's
finding. The evidence also does not show conclusively to the contrary, and we also find it factually
sufficient to support the verdict. See Green v. State, 567 S.W.2d 211 (Tex. Crim. App. [Panel Op.]
1978) (threat to "cave in" victim's head if he did not give money was sufficient to prove statutory
requirements, including imminent bodily injury). The contention of error is overruled.
Â Â Â Â Â Â Â Â Â Â Â Â B.Â Â Â Â Â Â Â Â Proof of Requisite Mental State
Â Â Â Â Â Â Â Â Â Â Â Â The separate issue as set out by counsel is whether the evidence is factually insufficient to
prove Coleman possessed the requisite intentional or knowing mental state at the time he threatened
Melvin. The contention focuses on Coleman's position that his intent was not to harm them, but to
assist him to escape. 
Â Â Â Â Â Â Â Â Â Â Â Â As already discussed, aggravated assault by threat is described as a nature-of-conduct offense. 
See Guzman, 988 S.W.2d at 887. Accordingly, our focus is not on a victim's perception of the
defendant's behavior; rather, we look at the acts and culpability of the defendant, that is, whether the
defendant intended to cause or knowingly "cause[d] in the victim a reasonable apprehension of
imminent bodily injury." Edwards, 57 S.W.3d at 680. There is evidence of an apprehension of
imminent injury. In light of the fact that Coleman was brandishing a pistol, and that another brother
had already been shot by Coleman's friend, we cannot say the jury's finding on this matter was error. 
Looking at the evidence in the required neutral posture, we also cannot say there is evidence showing
conclusively that Coleman did not have the necessary intent. The contention of error is overruled.



Â Â Â Â Â Â Â Â Â Â Â Â C.Â Â Â Â Â Â Â Â Proof of Use of Deadly Weapon
Â Â Â Â Â Â Â Â Â Â Â Â Coleman also contends the evidence is legally insufficient to prove that the deadly weapon
used or exhibited during the assault was a firearm, because the evidence shows he used or exhibited
a "gun," and the two terms are not necessarily interchangeable. As pointed out by the State, a firearm
is, per se, a deadly weapon. However, a "gun" is not necessarily a firearm. Tex. Pen. Code Ann.
Â§ 46.01(3) (Vernon 2003) defines a firearm as "any device designed, made, or adapted to expel a
projectile through a barrel by using the energy generated by an explosion or burning substance or any
device readily convertible to that use." We have reviewed the testimony. Although, obviously, the
shorthand term "gun" could mean anything from a grease gun to a BB gun to an electron gun to a toy
gun, the testimony of those looking down its barrel in this case consistently described it as a revolver,
probably .38 caliber. Melvin stated that it was a "real gun" and that it "looks to be like maybe a .38
special . . . ." Richard testified "Demetrice came up with a .45 or a .38 or something." That is
evidence from which a jury could conclude the device was a gun of the firearm variety. There is no
evidence to the contrary. The evidence is factually and legally sufficient to allow the jury to
conclude the device was a firearm. The contention of error is overruled.
Jury Instruction
Â Â Â Â Â Â Â Â Â Â Â Â A.Â Â Â Â Â Â Â Â Conduct Elements
Â Â Â Â Â Â Â Â Â Â Â Â Coleman next contends the trial court erred by failing to properly instruct the jury on the
conduct elements applicable to this offense. The jury charge read:
A person acts intentionally, or with intent, with respect to a result of his
conduct when it is his conscious objective or desire to cause the result.
Â 
A person acts knowingly, or with knowledge, with respect to a result of his
conduct when he is aware that his conduct is reasonably certain to cause the result.

Â Â Â Â Â Â Â Â Â Â Â Â As discussed above, assault by threat is treated as a "nature of conduct" offense, rather than
a "result of conduct" offense. The instruction is thus erroneous, because the wrong portion of the
definition of those two forms of intent was given to the jury by the court. See Tex. Pen. Code Ann.
Â§ 6.03 (Vernon 2003); Guzman, 988 S.W.2d at 887.Â Â  
Â Â Â Â Â Â Â Â Â Â Â Â The portion of Section 6.03 that would properly have reflected the evidence and charge in
this case reads as follows:
(a) A person acts intentionally, or with intent, with respect to the nature of
his conduct . . . when it is his conscious objective or desire to engage in the conduct
. . . .
Â 
(b) A person acts knowingly, or with knowledge, with respect to the nature
of his conduct or to circumstances surrounding his conduct when he is aware of the
nature of his conduct or that the circumstances exist.

Tex. Pen. Code Ann. Â§ 6.03.
Â Â Â Â Â Â Â Â Â Â Â Â However, there was no objection to the charge. The standard of review for errors in the jury
charge depends on whether the defendant properly objected. Mann v. State, 964 S.W.2d 639, 641
(Tex. Crim. App. 1998); Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on
reh'g); Gornick v. State, 947 S.W.2d 678, 680 (Tex. App.âTexarkana 1997, no pet.). If a proper
objection was raised, reversal is required if the error "is calculated to injure the rights of defendant." 
Almanza, 686 S.W.2d at 171. In other words, an error that has been properly preserved is reversible
unless it is harmless. Id. If a defendant does not object to the charge, reversal is required only if the
appellant shows this Court that harm is so egregious the appellant did not receive a fair and impartial
trial. Rudd v. State, 921 S.W.2d 370, 373 (Tex. App.âTexarkana 1996, pet. ref'd). 
Â Â Â Â Â Â Â Â Â Â Â Â Egregious harm consists of errors affecting the very basis of the case or that deprive the
defendant of a valuable right, vitally affect a defensive theory, or make the case for conviction or
punishment clearly and significantly more persuasive. Saunders v. State, 817 S.W.2d 688, 692 (Tex.
Crim. App. 1991); Hall v. State, 937 S.W.2d 580, 583 (Tex. App.âTexarkana 1996, pet. ref'd). We
determine harm in light of the entire jury charge, the state of the evidence, including contested issues
and the weight of the probative evidence; the argument of counsel; and any other relevant
information revealed by the record as a whole. Mann, 964 S.W.2d at 641; Rudd, 921 S.W.2d at 373. 
The purpose is to illuminate the actual, not just the theoretical, harm to the accused. Rudd, 921
S.W.2d at 373; Hines v. State, 978 S.W.2d 169, 175 (Tex. App.âTexarkana 1998, no pet.).
Â Â Â Â Â Â Â Â Â Â Â Â In this case, our review of the record thus focuses on whether the jury could conclude
Coleman intended to cause or knowingly caused in the victim a reasonable apprehension of
imminent bodily injury. There is evidence of a fear of imminent injury. The mere presence of a
deadly weapon, under proper circumstances, can be enough to instill fear and threaten a person with
bodily injury. DeLeon v. State, 865 S.W.2d 139, 142 (Tex. App.âCorpus Christi 1993, no pet.). 
As previously discussed, in light of the fact that Coleman was brandishing a pistol, and that another
brother had already been shot by Coleman's friend, we cannot say that, under the hypothetically
correct jury charge construct, the evidence is insufficient to support a finding of guilt based on the
nature of Coleman's conduct or that egregious harm has been shown. The contention of error is
overruled.
Â Â Â Â Â Â Â Â Â Â Â Â B.Â Â Â Â Â Â Â Â That Intent might be Inferred
Â Â Â Â Â Â Â Â Â Â Â Â Coleman next contends the trial court erred by including language in the charge stating that
"intent may be inferred from acts done, words spoken, or both." He takes the position that this
constitutes a comment on the weight of the evidence and that he therefore suffered egregious harm
because of the inclusion of this language in the charge. The language was taken from Tex. Pen.
Code Ann. Â§ 6.03(a), (b). Coleman directs our attention to cases in which a court selected a single
inference and directed the jury's attention to this language in connection with that inference, and in
which the court concluded that doing so was error because it suggested the court's desired result to
the jury. See Browning v. State, 720 S.W.2d 504, 507 (Tex. Crim. App. 1986). 
Â Â Â Â Â Â Â Â Â Â Â Â The court in this case provided a statutory definition to inform the jury it could draw
inferences from the evidence. We addressed this issue directly in Peterson v. State, 942 S.W.2d 206
(Tex. App.âTexarkana 1997, pet. ref'd). In that case, we recognized that the Texas Court of
Criminal Appeals had addressed the propriety of instructing a jury on inferences, holding that, "when
the trial court, the only source of law the jury has, picks out only one such inference and instructs
the jury that that one, though rebuttable, is a presumption provided by law, the court gives the force
of law to that one possible inference." Browning, 720 S.W.2d at 507. We recognized that the court
had concluded singling out one inference would be improper because it constitutes a comment on
the weight of the evidence.


 
Â Â Â Â Â Â Â Â Â Â Â Â We then noted that the Texas Court of Criminal Appeals reviewed a jury charge similar to
the charge in Peterson, and in the present case, in Garcia v. State. The trial court in Garcia
instructed the jury that "intent or knowledge may be inferred by acts done or words spoken." Garcia
v. State, 919 S.W.2d 370, 396 (Tex. Crim. App. 1996). We recognized that both Garcia and 
Peterson had timely objected to the included phrase as an impermissible comment on the evidence. 
The court assumed, without addressing the merits of Garcia's assertion, it was error to include the
disputed phrase in the jury charge. Id.
Â Â Â Â Â Â Â Â Â Â Â Â Because of the court's ruling, we concluded we were constrained to hold that the charge in
Peterson, 942 S.W.2d at 207â08, was an improper comment on the weight of the evidence and we
moved on to a harm analysis. 
Â Â Â Â Â Â Â Â Â Â Â Â Since that time, several other courts reviewed this same scenario and came to differing
conclusions. The San Antonio and Fort Worth courts tended to agree with our initial conclusion that
the jury should not be given such an instruction.


 The Dallas court held to the contrary in Brown v.
State, 92 S.W.3d 655, 663 (Tex. App.âDallas 2002, pet. granted), reasoning that, because Garcia
did not rule on the question, it was not controlling, and concentrated on the logic employed in the
cases predating Garcia, which focused on the question whether the instruction improperly directed
the jury's attention to particular evidence.
Â Â Â Â Â Â Â Â Â Â Â Â The Texas Court of Criminal Appeals has now released its opinion in Brown v. State, No.
0059-03, 2003 Tex. Crim. App. LEXIS 910 (Tex. Crim. App. Dec. 3, 2003). In that opinion, it has
redirected the discussion to the central point, which is whether giving the instruction constitutes an
improper judicial comment. In connection with how to determine if the instruction reaches that
level, the court has devised a sliding "improper-judicial-comment" scale for our use in analyzing the
issue. The court delineated a sort of scale between the high endâa comment that imposes a
mandatory presumption on a jury's decision-making process, through instructions on nonstatutory
presumptions like those used by appellate courts to analyze evidence for sufficiency or singling out
a specific type of evidence and telling the jury it may infer an element of the crime from that
evidence, to the low endâthat being an instruction neutral in itself, but that does not directly connect
to specific evidence. Brown, 2003 Tex. Crim. App. LEXIS, 910 at *23.
Â Â Â Â Â Â Â Â Â Â Â Â After this discussion, the court then reviewed an instruction reading: "intent or knowledge
may be inferred by acts done or words spoken." The court reasoned it was a "benign"
instructionâproviding no presumption that could be improperly applied by the jury and that also did
not link itself directly to any specific set of facts or pluck out any particular piece of evidence for its
application. The court decided that the instruction was marginally on the wrong side of the scale
because it was simply unnecessary and failed to clarify the law for the jury, and that it was indeed
improper. Therefore, the court found error in giving the instruction to the jury, but further held such
error was not harmful. 
Â Â Â Â Â Â Â Â Â Â Â Â The instruction in this case is not materially different. It reads: "Intent may be inferred from
acts done, words spoken, or both." Thus, we must also find error in this case. We now turn to a
review of harm. The standard of review for errors in the jury charge depends on whether the
defendant properly objected. Mann, 964 S.W.2d at 641; Almanza, 686 S.W.2d at 171; Gornick, 947
S.W.2d at 680. If a proper objection was raised, reversal is required if the error "is calculated to
injure the rights of defendant." Almanza, 686 S.W.2d at 171. In other words, an error that has been
properly preserved is reversible unless it is harmless. Id. If a defendant does not object to the
charge, reversal is required only if the harm is so egregious the defendant has not had a fair and
impartial trial. Rudd, 921 S.W.2d at 373. 
Â Â Â Â Â Â Â Â Â Â Â Â Where there has been no objection, we will reverse only if the appellant has shown that the
error caused him or her egregious harm. Abdnor v. State, 871 S.W.2d 726, 732 (Tex. Crim. App.
1994); Peterson, 942 S.W.2d at 208. In this case, Coleman argues that the instruction constitutes
a comment on the weight of the evidence, and as submited, assumes the existence of an element of
the offense and instructs the jury as to what facts support that conclusion. Therefore, he suggests,
the instruction invited the jury to give more weight to the testimony of the State's witnesses, because
they were the only witnesses to testify about matters from which intent could be inferred (since the
defendant testified he did not commit the act). 
Â Â Â Â Â Â Â Â Â Â Â Â However, that same situation also existed in Brown. The court found, even in a situation
where the claimed error was preserved by objection, that the instruction was "mild, neutral, and an
obvious common-sense proposition." Brown, 2003 Tex. Crim. App. LEXIS, at 910 *23. The court
concluded the error was not in any sense harmful under Almanza and affirmed. If this instruction
did not meet the test of causing some harm to the defendant in Brown, the same instruction here
cannot constitute egregious harm. We find the error to be harmless. 
Â Â Â Â Â Â Â Â Â Â Â Â We affirm the judgment of the trial court.



Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Jack Carter
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Justice

Date Submitted:Â Â Â Â Â Â Â Â Â Â December 10, 2003
Date Decided:Â Â Â Â Â Â Â Â Â Â Â Â Â January 7, 2004

Do Not Publish




st-language:
EN-US;mso-bidi-language:AR-SA'>[1]  Formal shareholder and board meetings were
infrequent and they regularly conducted votes through unanimous written
consents.Â  

Â Â Â Â Â Â Â Â Â Â Â  Basically,
an internecine power struggle over the control of MRMC arose between the
brothers. Although the nature of the brothersÂ dispute is complicated,
essentially Ruben contended that Scott was trying to take control of the
company, while Scott took the position that it was RubenÂs goal to ÂfreezeÂ
Scott out from corporate management. Â Beginning
in 2006, the brothersÂ relationship began to deteriorate regarding the general
direction of the company and their collegial relationship was finally fractured
in 2007 when Ruben decided that MRMC should seek to acquire a California
refinery, while Scott opposed the move.Â 
This course of events led Scott to attempt to stop the purchase by
formalizing MRMCÂs corporate decision-making process, which would impose checks
on any type of unilateral control of the company by Ruben.Â  Meanwhile, control of the board of directors remained
in flux.Â  

Â Â Â Â Â Â Â Â Â Â Â  In an effort to
settle their dispute over corporate control, Ruben and Scott met together and
hammered out an agreement, which was monumentalized in a nineteen-paragraph
document captioned ÂSettlement AgreementÂ drafted by ScottÂs attorney and
signed on January 29, 2008.[2]Â  Among other things, the agreement required
the brothers to negotiate a shareholder agreement in good faith for sixty days (later
extended by agreement to ninety days) and that upon completion of Âall of the
obligations under this Settlement AgreementÂ (defined as the ÂCompletion DateÂ),
certain other obligations would arise.Â 
Although the parties negotiated, they were unable to agree on the terms
of a shareholder agreement and none of the remaining terms have been fulfilled.

Â Â Â Â Â Â Â Â Â Â Â  Although
he acknowledged the failure to arrive at an agreement concerning the content of
a shareholdersÂ agreement, Scott characterized RubenÂs failure to perform the
other obligations set forth in the agreement as a breach of contract. Â Scott brought suit to enforce the agreement,
seeking specific performance and damages.[3]Â  After a ten-day trial, the trial court
submitted the case to the jury on the issues of breach and damages.[4]Â  In doing so, the trial court impliedly found
the agreement was an enforceable contract.Â 
Holt Atherton Indus., Inc. v.
Heine, 835 S.W.2d 80, 83 (Tex. 1992); Burnett
v. Motyka, 610 S.W.2d 735, 736 (Tex. 1980) (per curiam) (conclusions of law
that are necessary, but not made, are deemed in support of judgment).Â  The jury found Ruben breached the agreement
and awarded Scott $3.2 million in damages and attorneyÂs fees of $1.5
million.Â  The judgment awarded Scott $3.2
million in accord with the jury verdict, included provisions requiring specific
performance by Ruben of certain portions of the settlement agreement, and
awarded $13,533.85 in costs to Scott.Â 
Ruben filed a motion for judgment notwithstanding the verdict and
alternatively a motion for new trial, contending Scott was not entitled to
judgment because the settlement agreement was unenforceable as a matter of law.
Â That motion was overruled by operation
of law.

Â Â Â Â Â Â Â Â Â Â Â  In the race to
appeal, Scott prevailed.Â  In his sole
point of error, Scott claims that he was entitled to recover $16,028.15 in
costs, rather than the $13,533.85 awarded in the judgment, alleging that the
trial court had acted arbitrarily, picking a number between the cost figure
proved up by Scott and the number argued for by Ruben.Â  Ruben filed a cross-appeal.Â  In his reply brief, Ruben streamlined his
issues and argument.[5]
Â While his principal brief presented four
issues, RubenÂs basic issues, as joined by Scott on cross-appeal, are whether
the January 29, 2008, settlement agreement is legally enforceable, and if so,
whether Scott was entitled to an award of both money damages and specific
performance for breach of the agreement.Â 
Because the settlement agreement is not enforceable as a matter of law,
we reverse the judgment of the trial court and render judgment for Ruben.Â  

II.Â Â Â Â Â Â Â  ANALYSIS

Â Â Â Â Â Â Â Â Â Â Â  Because
resolution of RubenÂs issues is determinative of ScottÂs point of error
regarding the award of court costs, the issues raised by Ruben will be
considered first.

Â Â Â Â Â Â Â Â Â Â Â  In
his first issue on cross-appeal, Ruben contends the settlement agreement is an
unenforceable agreement to agree.Â  Scott
contends that this issue (not having been submitted to the jury) was abandoned
and, thus, waived on appeal.Â  We first
address the issue of whether the agreementÂs enforceability was properly
preserved and then discuss the merits of the issue.Â  

Â Â Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â Â Â  The
Enforceability Issue Was Preserved

Â Â Â Â Â Â Â Â Â Â Â  The central issue
raised in this appeal is whether the partiesÂ January 29, 2008, settlement
agreement is an unenforceable agreement to agree.Â  Scott contends that Ruben abandoned the
contract formation issue by not submitting a question to the jury on this issue
and in failing to object to the absence of such a question.Â  This contention is based on RubenÂs concession
that he assented to the settlement agreement individually, but his assent to
its terms was not in a representative capacity.Â 
On appeal, Ruben places more emphasis on the enforceability of the
settlement agreement than at the trial level and relies less on the issue of
the capacity under which he was operating at the time he signed the settlement
agreement.Â  Because he raised this issue
in his motion for directed verdict and in his motion for judgment notwithstanding
the verdict, or in the alternative, motion for new trial, Ruben contends that
the issue of the contractÂs legal enforceability has successfully been
preserved.Â  We agree.

Â Â Â Â Â Â Â Â Â Â Â  BlackÂs
Law Dictionary defines a ÂcontractÂ as Â[a]n agreement between two or more
parties creating obligations that are enforceable or otherwise recognizable at
law.ÂÂ  BlackÂs
Law Dictionary 365 (9th ed. 2009).Â 
According to the Restatement of Contracts, the terms ÂagreementÂ and ÂcontractÂ
are not synonymous; ÂagreementÂ refers to a Âmanifestation of mutual assent on the
part of two or more persons,Â whereas the term ÂcontractÂ refers to Âa promise
or a set of promises for the breach of which the law gives a remedy, or the
performance of which the law in some way recognizes a duty.ÂÂ  Restatement
(Second) of Contracts Â§Â§ 1, 3 (1981); see, e.g., Wiley v. Bertelsen,
770 S.W.2d 878, 882 (Tex. App.ÂÂTexarkana 1989, no writ) (noting that the term ÂagreementÂ
is more broad than the term ÂcontractÂ and that it is possible for parties to
enter into an agreement but still not have a contract).Â  Although it is possible to enter into an
agreement without forming a contract, the converse is not true.

Â Â Â Â Â Â Â Â Â Â Â  Texas
Pattern Jury Charge 101.1 sets forth the basic question regarding the existence
of a contract.Â  Texas Pattern Jury Charges, Business, Consumer, Insurance &
Employment, PJC 101.1 (2008).Â  The
commentary to this basic question of the existence of a contract states that
101.1 Âsubmits the issue of the existence of an agreement.Â  It should be used if there is a dispute about
the existence of an agreement or its terms and a specific factual finding is
necessary to determine whether the agreement constitutes a legally binding
contract.ÂÂ  Id.Â  Rather than contending
that a fact issue (which would require resolution by a jury) existed with respect
to whether the contract was legally binding, Ruben maintained that the contract
was not enforceable as a matter of law. 

Â Â Â Â Â Â Â Â Â Â Â  The
failure to object to the omission of a question on contract formation, when
taking the position that no contract exists in the first instance, is
inconsistent with a waiver of that position.Â 
RubenÂs concession that a fact issue did not exist on the intent to
agree does not, however, resolve the issue of whether the contract is legally
enforceable.Â  In essence, Ruben complained
that there was no evidence to warrant the submission of a question of contract
formation to the jury because, as a matter of law, the contract was
unenforceable.Â  The question of whether
an agreement is an unenforceable agreement to agree is a question of law, not a
question for the jury.Â  See Mickens v. Longhorn DFW Moving, Inc.,
264 S.W.3d 875, 880 (Tex. App.ÂÂDallas 2008, pet. denied) (ÂWhether a contract
is legally enforceable is a question of law for the courtÂnot a fact issue for
the jury.Â); Meru v. Huerta, 136
S.W.3d 383, 390 (Tex. App.ÂÂCorpus Christi 2004, no pet.) (Â[W]hether a
particular agreement is an enforceable contract is generally a question of law.Â).


Â Â Â Â Â Â Â Â Â Â Â  Moreover,
Ruben properly preserved the issue of whether the contract was legally
enforceable as a matter of law.Â  To
preserve an issue of law, the appellant must
raise the issue through one of the
following: Â (1) a motion for directed
verdict; (2) a motion for judgment notwithstanding the verdict; (3) an
objection to the submission of the question to the jury; (4) a motion to
disregard the juryÂs answer to a vital fact question; or (5) a motion for new
trial. Â See Cecil v. Smith, 804 S.W.2d 509, 510Â11 (Tex. 1991);
United Parcel Serv., Inc. v. Tasdemiroglu,
25 S.W.3d 914, 916 (Tex. App.ÂÂHouston [14th Dist.] 2000, pet. denied). Â Ruben filed a motion for directed verdict on
the issue of whether the contract was legally enforceable based on its status
as an executory contract both at the conclusion of the plaintiffÂs case-in-chief
and at the conclusion of the evidence.Â 
On each occasion, the motion was overruled.Â  In addition, Ruben filed a motion for
judgment notwithstanding the verdict and, alternatively, motion for new trial
relying on this issue.Â  This motion was
overruled by operation of law.Â  

Â Â Â Â Â Â Â Â Â Â Â  Because
Ruben raised this issue of law by filing the appropriate motions, the issue of
the agreementÂs enforceability was properly preserved.

Â Â Â Â Â Â Â Â Â Â Â  B.Â Â Â Â Â Â Â  The Settlement Agreement Is
Unenforceable as a Matter of Law

Â Â Â Â Â Â Â Â Â Â Â  The
primary issue in this case is whether the language expressly set forth in the
agreement was sufficiently definite to be enforceable against Ruben.Â  Whether a particular agreement is an
enforceable contract is a question of law reviewed de novo.Â  Perry
Homes v. Cull, 258 S.W.3d 580, 598 (Tex. 2008); Elijah Ragira/VIP Lodging Group, Inc. v. VIP Lodging Group, Inc.,
301 S.W.3d 747, 754 (Tex. App.ÂÂEl Paso 2009, pet. denied).Â  On appellate review, we are not required to
give any particular deference to the trial courtÂs legal conclusion that the
contract was legally enforceable.Â  See Cap Rock Elec. Co-op., Inc. v. Tex.
Utils. Elec. Co., 874 S.W.2d 92, 99 (Tex.
App.ÂÂEl Paso 1994, no pet.). Â Rather, we
are required to independently evaluate the trial courtÂs legal
determination.Â  Id.Â  Legal conclusions of a
trial court are to be reversed only when they are erroneous as a matter of
law.Â  AmericaÂs
Favorite Chicken Co. v. Samaras, 929 S.W.2d 617, 622 (Tex. App.ÂÂSan Antonio
1996, writ denied). Â 

Â Â Â Â Â Â Â Â Â Â Â  Even
though Ruben acknowledged (with few qualifications) his assent to every term of
the settlement agreement, he maintains that by its express terms, the agreement
is not a final, enforceable contract; he maintains that it was, rather, a mere
listing of areas the two brothers planned to address over the next few months
in an attempt to resolve their disputes.Â 
The first paragraph of the agreement calls for the negotiation of a
shareholder agreement binding on all MRMC shareholders.[6] Â It provides that:

(1) Scott and Ruben will negotiate a shareholder
agreement (ÂShareholder AgreementÂ) that will be applicable to all
shareholders.Â  It will provide that Ruben
will continue to be the CEO of Martin Resource Management Corporation (ÂMRMCÂ)
but the authority to conduct the day to day operations of MRMC will be subject
to those responsibilities that are delegated to him by the Board of Directors
of MRMC.Â  Scott shall have the ability to
determine what authority the Board will delegate to Ruben.Â  ScottÂs duties will need to be more clearly
defined and delegated by the Board as well.Â 
The Shareholders Agreement will contain provisions typically found in
large, complex corporations, including provisions governing liquidity for all
the shareholders.Â  The parties will
negotiate in good faith the provisions of the Shareholders Agreement and try to
reach agreement on some form of buy-sell provisions contained therein.Â  Such buy-sell provision will be subject to a
1 yr. lockup period.Â  Finally, the
Shareholder Agreement will require at least quarterly Board meetings.

Â 

Â Â Â Â Â Â Â Â Â Â Â  It
is undisputed that the parties never arrived at an agreement for the content of
a shareholder agreement and never executed one.[7]Â  

Â Â Â Â Â Â Â Â Â Â Â  Paragraphs
five through nine, eleven, and thirteen through fifteen each contain provisions
that are triggered by the ÂCompletion Date,Â as that term is defined in the
agreement.[8]Â  The ÂCompletion DateÂ is defined as the
completion Âof all of the obligations under this Settlement Agreement.ÂÂ  The dependent provisions include: Â (1) Wes SkeltonÂs resignation as MRMC ESOP
Trustee; (2) ScottÂs resignation as trustee for RubenÂs family trusts; (3) MRMCÂs
extension of employment agreements to Scott and Ruben; (4) ScottÂs, RubenÂs,
and the MRMC board membersÂ execution of mutual releases from any and all
claims related to issues subject to the agreement; (5) RubenÂs transfer of one
share of MRMC stock to Scott; (6) NeumeyerÂs and SkeltonÂs resignations from
MRMCÂs board, to be replaced by RubenÂs and ScottÂs respective designees; (7)
the extension of $2,000,000.00 loans to Scott and to Ruben, respectively, upon
approval of Amegy (MRMCÂs financing arm); (8) reimbursement by MRMC of all
legal fees incurred by Scott, Ruben, and Margaret Martin related to the negotiations;
and (9)Â conversion of all outstanding MRMC stock options to Ânon-voting,Â
to last until the termination of AngelaÂs Trust.[9]

Â Â Â Â Â Â Â Â Â Â Â  The
bedrock of the instant dispute is that Ruben and Scott differ over the meaning
of paragraph one of the settlement agreement.Â 
The interpretation of this paragraph is central to the issue of the
agreementÂs enforceability.Â  Ruben
maintains that the plain meaning of the settlement agreement is that Scott and
Ruben would spend sixty days (later extended to ninety days) to negotiate a
shareholder agreement (paragraph one) and other items that would resolve the
issues between them (the remaining provisions of the agreement).Â  Although the parties negotiated for a period
of ninety days, no shareholder agreement was reached, and none of the remaining
agreements were carried out.[10]Â  Ruben thus contends that because the
obligations under the settlement agreement (including the negotiation of a
shareholder agreement) were not completed, the ÂCompletion DateÂ never
occurred.Â  As a result, none of the
dependent provisions were triggered.[11]Â  

Â Â Â Â Â Â Â Â Â Â Â  When
an agreement leaves material matters open for future adjustment and agreement
that never occur, it is not binding on the parties and merely constitutes an
agreement to agree. Â Fort Worth Indep.
Sch. Dist. v. City of Fort Worth,
22 S.W.3d 831, 846 (Tex. 2000), superseded
by statute on other grounds, Vantage
Sys. Design, Inc. v. Raymondville Indep. Sch. Dist., 290 S.W.3d 312, 316
(Tex. App.ÂÂCorpus Christi 2009, pet. filed); Sadeghi v. Gang, 270 S.W.3d 773, 776 (Tex. App.ÂÂDallas 2008, no
pet.). Â Said another way, a party cannot
accept an offer so as to form a contract unless the terms of that contract are
reasonably certain.Â  Fort Worth Indep. Sch. Dist., 22 S.W.3d at 846.Â  Contract terms are reasonably certain Âif
they provide a basis for determining the existence of a breach and for giving
an appropriate remedy.Â Â Restatement (Second) of Contracts Â§
33(2) (1981).Â  If an alleged agreement is
so indefinite as to make it impossible for a court to fix the legal obligations
and liabilities of the parties, it cannot constitute an enforceable
contract.Â  Playoff Corp. v. Blackwell, 300 S.W.3d 451, 455 (Tex. App.ÂÂFort
Worth 2009, pet. denied).

Â Â Â Â Â Â Â Â Â Â Â  Conversely,
enforceable settlement agreements need only Âcontain sufficient terms to
determine the partiesÂ obligations but [are] not required to resolve all
disputed issues.ÂÂ  W. Beach Marina, Ltd. v. Erdeljac, 94 S.W.3d 248, 258Â59 (Tex. App.ÂÂAustin
2002, no pet.).Â  ÂWhere the evidence
shows that the parties intended to enter into an agreement, the courts should
find the contract to be definite enough to grant a remedy provided that there
is a certain basis for determining the remedy.ÂÂ 
AmericaÂs Favorite Chicken Co.,
929 S.W.2d at 623. Â Parties may therefore
agree upon some contractual terms, understanding them to be an agreement, and
leave other contract terms to be made later.Â 
T.O. Stanley Boot Co. v. Bank of
El Paso, 847 S.W.2d 218, Â 221 (Tex.
1992).Â  It is only when an essential term
is left open for future negotiation that there is nothing more than an
unenforceable agreement to agree.Â  Id.Â 
The parties here disagree regarding the enforceability of the contract
based on (1) whether the completion date, as that term is defined in the
agreement, was reached; and (2) whether the shareholder agreement was an
essential term of the overall agreement. 

Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â Â Â  (1)Â Â Â Â Â Â Â  A Completion Date Was Not Reached 

Â Â Â Â Â Â Â Â Â Â Â  Ruben
contends the parties, as a part of their ÂobligationsÂ under the settlement
agreement, were required to not only negotiate, but to actually reach a
shareholder agreement, reduce it to writing, sign it, and adopt it as an
antecedent to the other obligations.Â 
Without this obligation being brought to fruition, a ÂCompletion DateÂ
never happens.Â  Without a ÂCompletion Date,Â
none of the nine dependent provisions take place.Â  In this scenario, the trial court could not
determine what the partiesÂ rights and obligations would be under the
settlement agreement because the court could not possibly know what agreement
the parties would have negotiated. 

Â Â Â Â Â Â Â Â Â Â Â  Scott
contends the obligation was simply to negotiate (but not necessarily agree upon
and adopt) a shareholder agreement, and the parties had sixty days in which to
do so (later extended to ninety days).Â 
According to Scott, the ÂCompletion DateÂ is reached by fulfilling the
obligation to negotiate as set out by paragraph number one of the settlement
agreement.Â  In support of this position,
Scott relies on Geophysical Micro
Computer Applications (IntÂl) Ltd. v. Paradigm Geophysical Ltd., No.
05-98-02016-CV, 2001 WL 1270795, at *6 (Tex. App.ÂÂDallas Oct. 24, 2001, pet.
denied) (not designated for publication) (finding an obligation to Ânegotiate
in good faithÂ satisfied Âthe mutuality of obligation requirement as a matter
of lawÂ). 

Â Â Â Â Â Â Â Â Â Â Â  Paradigm involved a letter of intent
regarding the purchase of computer software.Â 
The letter clearly identified the asset to be sold, its price and
adjustments to the purchase price, royalties, a method to calculate the closing
date, and the payment of financing terms.Â 
The letter of intent also provided for Âother termsÂ regarding due
diligence, responsibility for closing documents, and other Ânecessary
commercial terms.Â Â There was no evidence
in this summary judgment case that the Âother termsÂ or other Ânecessary
commercial termsÂ were essential for the contract.Â  The court held that the trial court
improperly granted summary judgment because the evidence was disputed and the
language in the document was inconclusive on whether the parties intended the
agreement to be a memorialization of the partiesÂ agreement or a condition
precedent to the formation of a contract. Â Id.Â 
Paradigm also moved for summary judgment on the basis that the letters
were not enforceable because they lacked mutuality of obligation, i.e., they
were subject to the partiesÂ corporate approval, and ParadigmÂs board had
disapproved and rejected the transaction.Â 
Because the letter required the parties to negotiate in good faith, the
mutuality of obligation requirement was satisfied as a matter of law; the issue
of whether Paradigm discharged this obligation in good faith was a question of
fact.Â  Id. Â Because this case
focuses on mutuality of obligations, and not whether an agreement to negotiate
in good faith amounts to an enforceable contract, it is not persuasive.Â  Mutuality of obligation does not render an
otherwise unenforceable contract, lacking essential terms, enforceable.Â  

Â Â Â Â Â Â Â Â Â Â Â  Ruben
maintains that an agreement to negotiate in the future is unenforceable, even
if the agreement calls for a good-faith effort in negotiations, citing John Wood Group USA, Inc. v. ICO, Inc.,
26 S.W.3d 12, 21 (Tex. App.ÂÂHouston [1st Dist.] 2000, pet. denied).Â  This case involved a letter agreement for the
sale of corporate assets, which stated that the essential terms of the proposed
sale were Ânot binding.ÂÂ  The jury
awarded damages for breach of contract.Â 
On appeal, the appellant maintained that even if the sale provisions
were held to be unenforceableÂas they wereÂthe damages should nevertheless
stand because the Wood Group breached the good-faith clause of the letter
agreement, by which both parties intended to be bound.Â  In support of that proposition, appellant
relied on Illinois law, under which agreements to negotiate toward the
formation of a contract are themselves enforceable as contracts.Â  The court recognized, however, that under
Texas law, an agreement to negotiate in the future is unenforceable, even if
the agreement calls for a Âgood faith effortÂ in the negotiations.Â  Id.
at 21 (citing Radford v. McNeny, 129
Tex. 568, 104 S.W.2d 472, 474 (1937); Maranatha
Temple, Inc. v. Enter. Prods. Co., 893 S.W.2d 92, 104 (Tex. App.ÂÂHouston
[1st Dist.] 1994, writ denied) (presence of term Âgood faith effortÂ in
agreement not talismanic; its presence does not automatically mean the
provision that contains this phrase is enforceableÂan agreement to enter into
good-faith negotiations in future not enforceable)).Â  

Â Â Â Â Â Â Â Â Â Â Â  ScottÂs
argument, though creative, does not conform to Texas law.Â  The shareholder agreement must be executed,
not merely negotiated.Â  The agreement
itself supports this conclusion.Â 
Paragraph one states that the brothers Âwill negotiate a shareholder
agreementÂ that Âwill be applicable to all shareholders.Â Â Since the goal of negotiation is agreement, if the parties are
required to Ânegotiate an agreement,Â they must necessarily and ultimately
conclude with a negotiated agreement.Â 
Otherwise, the parties have only attempted to negotiate an
agreement.Â  Additionally, paragraph one
contains obligatory language which supports the conclusion that its terms
require the execution of a shareholder agreement.Â  It requires that (the shareholder agreement) Âwill
provide,Â Âwill contain,Â and Âwill require.Â Â Imperative statements such as these envision
the object to be accomplished will, in fact, be accomplished. Â In failing to negotiate a shareholder
agreement, the parties fell short of accomplishing this goal.Â  Thus, the completion dateÂmeaning completion Âof
all of the obligations under this Settlement AgreementÂÂwas not reached because
the obligation of executing a shareholder agreement was not completed.Â  Without a completion date, Ruben contends the
agreement is merely an agreement to agree in the future, which is not legally
binding. Â See Fort Worth Indep. Sch. Dist., 22 S.W.3d at 846.Â  

Â Â Â Â Â Â Â Â Â Â Â  However,
if the shareholder agreement provision of the agreement is not essential, as
Scott contends, the agreement can nevertheless be enforced.Â  See
T.O. Stanley Boot Co., 847 S.W.2d at 221
(only when essential term left open for future negotiation is agreement an
unenforceable agreement to agree).Â  We,
therefore, must determine whether the shareholder provision is essential to the
overall settlement agreement.Â  

Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â Â Â  (2)Â Â Â Â Â Â Â  The Shareholder Agreement Is Essential
to the Settlement Agreement

Â Â Â Â Â Â Â Â Â Â Â  Ruben maintains
that each provision of the settlement agreement is essential because all
obligations, i.e., each provision of the agreement, must be completed in order
to reach the completion date.[12]Â  Even so, Ruben characterizes the shareholder
provision as the ÂpearlÂ of the agreement, an essential provision.Â  The issue of essential contractual provisions
was recently addressed in Playoff Corp.,
300 S.W.3d 451.Â  

Â Â Â Â Â Â Â Â Â Â Â  In
that case, Blackwell brought suit against Playoff, a sports trading-card
company, for breach of contract.Â  Id. at 453.Â  After finding that a breach of contract
occurred, the jury found damages of $6.1 million, but the trial court granted a
take-nothing judgment notwithstanding the verdict, holding that the agreement
was Âlegally unenforceable.ÂÂ  Id. at 454.Â  The Fort Worth court affirmed.Â  The matters in dispute in Playoff involved an employment
agreement, the most hotly contested provision of which involved the issue of
payment by Playoff, the employer, to Blackwell, the employee.Â  That provision was summarized as follows:

Playoff . . . would pay Blackwell 25% of the
proceeds from the sale of Playoff or entities contemplated to be formed by the
parties, if any, after reducing the proceeds from the sale by $ 5,000,000.00
(Playoff's agreed fair market value at the time of the alleged employment
agreement); or 25% of the fair market value of Playoff or entities contemplated
to be formed by the parties, if any, after reducing the fair market value by $
5,000,000.00, on the last day of his employment if Playoff or any entity
contemplated to be formed by the parties terminated Blackwell's employment.

Â 

Id at 453. Â Because the term Âfair
market valueÂ was to be determined by Âadditional negotiation and agreement between
the parties,Â the Âalleged agreement left a material matter open for future
adjustment and agreement that never occurred.ÂÂ 
Id. at 457.Â  Consequently, the agreement was unenforceable
as a matter of law.Â  Id.

Â Â Â Â Â Â Â Â Â Â Â  In contrast to Playoff, Scott maintains that while the
parties contemplated future negotiations on some issues, including the
shareholder provision, future negotiations do not negate contractual intent as
a matter of law.Â  Komet v. Graves, 40 S.W.3d 596, 601Â02 (Tex. App.ÂÂSan Antonio
2001, no pet.).Â  In that case, an
employment agreement set out the material terms of the employeeÂs salary and
benefits, but also provided the following provisions: Â Â[a] commission schedule structure shall be
created and mutually agreed to and incorporated into this agreementÂ that was Âto
be determined by a future documentÂ and an Â[e]quity agreement to be determined
in subsequent document.ÂÂ  Id. at 599.Â  Because the agreement set out the effective date,
salary, health insurance provisions, and vacation time and other benefits, the
partiesÂ obligations were sufficiently outlined.Â  In Komet,
the court determined that the percentages were not material and therefore could
Âbe left open for future negotiations without destroying the contractÂs
effectiveness.ÂÂ  Id. at 602.Â  Because Komet determined that no essential
provision was left to future negotiation, the contract was enforceable.Â  

Â Â Â Â Â Â Â Â Â Â Â  Scott
makes the same argument in this case.Â  He
contends that the shareholder agreement was not essential to the overall
agreement because it was not imperative or indispensible, pointing out that the
installation of a four-member board was not predicated on the existence of a
shareholder agreement[13]
(which, according to Scott, was the key essential term to the entire
agreement).[14]Â  To effectuate the settlement agreement, the
four-member board of directors would come first, and then the other documents
would Âfall into place.Â[15]Â  Therefore, even when negotiations on the
shareholder agreement failed, the remaining provisions of the settlement
agreement wereÂÂin ScottÂs estimationÂÂenforceable.

Â Â Â Â Â Â Â Â Â Â Â  What
terms are ÂmaterialÂ or essential to a contract should be determined on an
agreement-by-agreement basis.Â  T.O. Stanley Boot Co., 847 S.W.2d at 221
(ÂEach contract should be considered separately to determine its material
terms.Â).Â  A close corporation such as
MRMC may, by statute, be managed either by a board of directors or in the
manner provided for in a shareholdersÂ agreement.Â  Tex.
Bus. Corp. Act Ann. art. 12.31(A)(2) (Vernon 2003).[16]Â  By statute, a shareholder agreement may
restrict the discretion or powers of the board of directors.Â  Or, the agreement can eliminate the board of
directors and authorize the business and affairs of the corporation to be
managed by one or more of its shareholders or other persons.Â  Tex.
Bus. Orgs. Code Ann. Â§ 21.101(b)(1).Â 


Â Â Â Â Â Â Â Â Â Â Â  Paragraph
one of the settlement agreement provides that the shareholder agreement will
delegate responsibility to Scott to determine what authority the board of
directors will delegate to Ruben to conduct the day-to-day operation of the
corporation.Â  ScottÂs duties are to be
more clearly defined and delegated by the board.Â  Further, the agreement will contain
provisions Âtypically found in large, complex corporations, including
provisions governing liquidity for all shareholders.ÂÂ  The agreement will also include buy-sell
provisions, Âsubject to a 1 yr. lockup period.ÂÂ 
Sufficient detail regarding corporate management and financial
governance is built into paragraph one to convince this Court that the
shareholder agreement was essential to the overall settlement agreement.Â  

Â Â Â Â Â Â Â Â Â Â Â  Further,
the proposed shareholder agreements drafted during the course of the partiesÂ
negotiations are detailed and comprehensive.Â 
The most recent (failed) draft of the shareholder agreement was thirty
pages in length with a detailed table of contents.Â  The draft shareholder agreement addressed
restrictions on disposition of shares, voluntary lifetime transfers,
involuntary lifetime transfers, purchase of shares on the death of a
shareholder or spouse of a shareholder, general provisions relating to
transfers, voting agreements, covenants of the corporation, and a number of
miscellaneous provisions.Â  Each of these
areas covered additional sub-topics in meticulous detail; each of these
provisions can be excruciatingly complex and subject to intense
negotiation.Â  

Â Â Â Â Â Â Â Â Â Â Â  While
Scott maintains the shareholder agreement is not essential, a plain reading of
the entire agreement indicates otherwise. Â The shareholder agreement, as envisioned in
the settlement agreement and as reflected by the drafts produced in
negotiations, would be the foundational document of MRMC and would define the
partiesÂ rights vis-Ã -vis each other and MRMC.Â 
Moreover, the shareholder agreement was fundamental to the enforcement
of nine of the remaining eighteen paragraphs which, by their express language,
are dependent on completion of all of the obligations under the agreement. 

Â Â Â Â Â Â Â Â Â Â Â  Because
the settlement agreement leaves this essential provision open for future
agreement that never occurred, it is not binding and merely constitutes an
agreement to agree in the future.Â  See Fort Worth Indep. Sch. Dist., 22
S.W.3d at 846; Playoff Corp., 300
S.W.3d at 455; Meru v. Huerta, 136
S.W.3d 383, 391 (Tex. App.ÂÂCorpus Christi 2004, no pet.).Â  As such, it cannot be enforced. 

Â Â Â Â Â Â Â Â Â Â Â  Because
we find the settlement agreement to be unenforceable as a matter of law, we
need not address the issue of whether the trial court erred in (1) awarding
money damages and specific performance for a breach of contract and (2)
awarding costs.

Â Â Â Â Â Â Â Â Â Â Â  We
reverse the judgment of the trial court and render a take-nothing judgment.

Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Bailey
C. Moseley

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Justice

Â 

Date Submitted:Â Â Â Â Â Â Â Â Â  October
13, 2010

Date Decided:Â Â Â Â Â Â Â Â Â Â Â Â  November
3, 2010











[1]Ruben
was President, Chief Executive Officer, and Chairman of the Board of MRMC, an
MRMC shareholder, and the trustee of the R. S. MartinÂs Children Trust No. 1
(AngelaÂs Trust).Â  Scott was Executive
Vice President of MRMC, a member of the Board of Directors, an MRMC
shareholder, and the trustee of the Ruben S. Martin, III, Dynasty Trust
(Dynasty Trust).Â  So long as Ruben was
trustee of AngelaÂs Trust and could control the votes of those shares, he had a
slight voting advantage over Scott.Â 
However, the time for the termination of the trust was fast approaching
and the brothersÂ mother had the ability to remove Ruben as trustee and name
another person in his stead.





[2]The
terms of the ÂSettlement AgreementÂ are summarized as follows:

Â 

Paragraph one: Â ÂScott
and Ruben will negotiate a shareholder agreement . . . .ÂÂ  

Â 

Paragraph two:Â 
ÂThe parties shall work together to better organize the use of MRMC
airplanes.ÂÂ  

Â 

Paragraph three: Â ÂScott may elect to sell any Colorado house
and the proceeds shall be split according to ownership in such house.Â

Â 

Paragraph four: Â ÂScott and Ruben shall be permitted to invite
anyone to the MRMC Board meetings.ÂÂ  

Â 

Paragraph five: Â ÂUpon completion of all of the obligations
under this Settlement Agreement (the ÂCompletion DateÂ), Wes Skelton
shall resign as a co-trustee of the ESOP and Ruben and Scott shall remain as
the sole co-trustees.Â 

Â 

Paragraph six: Â ÂUpon
the Completion Date, Scott shall resign from all trustee positions relating to
any trust of RubenÂs and a successor trustee shall be appointed at RubenÂs
discretion.ÂÂ  

Â 

Paragraph seven: Â ÂOn or before the Completion Date, Scott and
Ruben shall each be given Employment Agreements with equal compensation and
severance packages.Â 

Â 

Paragraph eight: Â ÂUpon the Completion Date, Scott, Ruben and
the officers and directors of MRMC shall execute mutual releases from any and
all claims related to the issues subject to this Agreement.Â

Â 

Paragraph nine: Â ÂUpon the Completion Date, Ruben will transfer
one share of common stock of MRMC to Scott.Â 

Â 

Paragraph ten: Â ÂScott
and Ruben will be the MRMC representatives appointed to the Arcadia joint venture
board of directors.ÂÂ  

Paragraph eleven: Â ÂUpon the Completion Date, Don Neumeyer and
Wes Skelton will resign from the MRMC Board.Â 
Ruben and Scott will each have the right to appoint 1 additional Board
member . . . . This shall be accomplished through a Unanimous Consent of
Shareholders.Â 

Â 

Paragraph twelve: Â ÂOn the Effective Date, Ruben and Scott shall
be appointed as co-investment trusteeÂs [sic] of AngelaÂs Trust.ÂÂ  

Â 

Paragraph thirteen: Â ÂUpon the Completion Date, Ruben and Scott
will each receive equal unsecured loans of up to $2,000,000 from MRMC, subject
to Amegy approval on all of the terms and conditions of such loan.ÂÂ  

Â 

Paragraph fourteen: Â ÂUpon the Completion Date, Scott, Ruben and
Margaret Martin will be reimbursed by MRMC for all legal, consulting and other
related expenses incurred in connection with the negotiation of the issues that
are the subject of this Settlement Agreement.ÂÂ 


Â 

Paragraph fifteen: Â ÂUpon the Completion Date, any and all
outstanding stock options in MRMC shall be converted to non-voting shares upon
exercise.ÂÂ  

Â 

Paragraph sixteen: Â ÂThere will be no shareholder votes except by
unanimous consent until the Completion Date.ÂÂ 


Â 

Paragraph seventeen: Â ÂBoard action for MRMC will only be taken
through unanimous consent until the Completion Date.ÂÂ  

Â 

Paragraph eighteen: Â ÂScott and Ruben will use their good faith
efforts to work through counsel to document the agreements contained herein
within sixty (60) days of the Effective Date.ÂÂ 


Â 

Paragraph nineteen:Â 
ÂAngela will become employed by MRMC (at a location of her choosing), if
she wishes.Â 





[3]Scott
maintains that because April 30, 2008, marked the end of the ninety-day
negotiation period under the agreement, this was the date upon which all
obligations under the agreement were to be fulfilled, i.e., the completion
date.Â  In his third amended original
petition, Scott alleged that ÂRuben has failed and refused to perform the
obligations and undertakings required of him under the terms of the Settlement
Agreement.Â 

Â 





[4]The
jury was also asked to determine whether Ruben and Scott were ultimately able
to vote 100% of the voting shares of MRMC on the date of the agreement, whether
Ruben and Scott were ultimately able to vote 67% of the voting shares on the
date of the agreement, and whether by virtue of their shared voting power on
the date of the agreement, Ruben and Scott were able to select and remove
officers and directors of MRMC as well as the trustees for the Martin Resource
Management Employee Stock Ownership Trust.Â 
The juryÂs positive response to these issues, as well as to the monetary
damage question, is not in dispute.





[5]In
his sur-reply brief, Scott contends Ruben improperly presented new issues on
reply, in violation of Rules 38.1(f) and 38.3 of the Texas Rules of Appellate
Procedure. Â Tex. R. App. P. 38.1(f) (ÂThe [initial]
brief must state concisely all issues or points presented for review.Â); Tex. R. App. P. 38.3 (reply brief
should address matters raised in appelleeÂs brief).Â  Because Ruben fully briefed the issues
regarding the agreementÂs legal enforceability and the propriety of the award
of specific performance in addition to monetary damages, these issues are
squarely before this Court.





[6]Shareholder
agreements in Texas are subject to the requirements of Chapter 21, Subchapter C
of the Texas Business Organizations CodeÂand require approval and ratification
by all shareholders, among other things, to be effective.Â  Tex.
Bus. Orgs. Code Ann. Â§ 21.101(b) (Vernon 2010 pamphlet). 





[7]Paragraphs
two, three, and four of the agreement address treatment of MRMC assets, such as
use of the MRMC planes, sale of any ÂColorado house,Â and ScottÂs and RubenÂs
ability to invite whomever they wish to attend MRMC Board meetings.Â  

Â 





[8]Each
of these paragraphs is prefaced by the language, ÂUpon the Completion Date,Â or
ÂOn or before the Completion Date.Â





[9]The
remaining paragraphsÂten, sixteen, seventeen, and nineteenÂrequire that the
MRMC Board could take action only by unanimous consent through the ÂCompletion DateÂ;
provide that Angela Alexander may be employed by MRMC at a location of her choosing,
and state that both Scott and Ruben will be the MRMC representatives appointed
to the Arcadia joint venture board of directors.Â  

Â 





[10]Ruben
points out that many of the provisions of the settlement agreement require MRMC
board approval.Â  Darren Inoff, attorney
for Scott, drafted the settlement agreement.Â 
Inoff provided Scott with a list of decisions that required MRMC board
approval.Â  Those decisions include:Â  the election or removal of officers from the
corporation; entering into or amending any employment or severance agreement
with any officer or employee of the corporation, and all compensation programs
(including base salaries and bonuses) for officers and key employees; the
purchase, sale, lease, transfer or other acquisition or disposition of assets
(including equity interests in any entity) in a transaction or series of
transactions in excess of a given amount; any real estate lease or purchase;
any commencement or settlement of any litigation; and approval of any other
item specifically required elsewhere in the shareholderÂs agreement, bylaws, or
articles of incorporation.Â  These
categories of actions requiring board approval apply to paragraphs three, five,
seven, eight, eleven, thirteen, fifteen, sixteen, and seventeen.Â  





[11]Paragraph
eighteen of the settlement agreement provides that ÂScott and Ruben will use
their good faith efforts to work through counsel to document the agreements
contained herein within sixty (60) days of the Effective Date.Â





[12]The
definition of ÂCompletion DateÂ as the completion of all obligations under the
agreement, in light of the nine provisions to be concluded upon the completion
date, creates a never-ending chain of events which cannot, logically, result in
a completion date.Â  





[13]The
provision requiring a four-member board is not a part of the shareholder
agreement; it is contained in paragraph eleven of the settlement
agreement.Â  Paragraph eleven states:

Â 

Upon the Completion Date, Don
Neumeyer and Wes Skelton will resign from the MRMC Board.Â  Ruben and Scott will each have the right to
appoint 1 additional Board member, it being assumed (but not required) that Bob
Bondurant will be RubenÂs appointment and Mike Gayler will be ScottÂs
appointment.Â  Courtney Stovall and Angela
Alexander shall also be appointed as advisory, non-voting Board members.Â  This shall be accomplished through a
Unanimous Consent of Shareholders.Â  Under
no circumstances will these changes constitute a Change of Control under any
employment agreement, retention or severance agreement or any other agreement
entered into by MRMC.Â  The current Board
shall execute a written consent authorizing these Board changes to confirm that
these changes shall not constitute a Change of Control.Â  The composition of the Board cannot be
changed until The R.S. Martin Jr., ChildrenÂs Trust No. One f/b/o Angela Santi
Jones (also known as Angela J. Alexander) (ÂAngelaÂs TrustÂ) terminates
upon which time any shareholder shall be entitled to call a special meeting for
the purpose of proposing a new slate of directors of the MRMC Board.Â  The Bylaws shall be amended accordingly to
permit this Board composition (since Bylaws currently require seven (7) Board
members).

Â 





[14]After
a hard fought battle, Scott and Ruben agreed on a board of Scott and his
designee and Ruben and his designee.Â  It
was not ScottÂs intention that the four-member board be contingent on or
subject to the successful negotiation of a shareholder agreement.Â  The four-member board provision does appear
to be an essential provision of the overall agreement, given the degree of
specificity it contains.Â  That does not,
however, resolve the issue of whether the shareholder provision is essential to
the settlement agreement.Â  

Â 





[15]Both
Scott and Ruben testified they could vote 100% of the shares of MRMC. Â Scott testified, with respect to paragraph
eleven, that if Skelton did not want to resign, he could be made to
resign.Â  Scott and Ruben controlled the
MRMC board vote on January 29, 2008, so any provisions requiring action by the
board of directors could be effectuated by their board votes.Â  The MRMC board appoints the trustees of the
ESOP as well, so the board could also effectuate changes to the ESOP.Â  





[16]This
section of the Business Corporation Act expired on January 1, 2010, but was in
effect at the time the settlement agreement was executed.Â  Tex.
Bus. Corp. Act Ann. art. 11.02
(Vernon Supp. 2010).